UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

Paul Conforti,

        Plaintiff,                          Case No. 20-cv-349

and


Humana Caresource,
ABC Insurance Company,

        Involuntary Plaintiffs,

v.


City of Franklin,
Christopher Rydelski,
Gary Wallace, and
League of Wisconsin Municipalities
Mutual Insurance,

        Defendants.

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

---

**NOW COMES THE PLAINTIFF,** Paul Conforti, through his attorneys, Gingras, Thomsen, and Wachs LLP, by Scott B. Thompson, and submits the following as his Proposed Findings of Fact ("PFOF.")

*Paul Conforti Saves a Friend*

PFOF 1.      On January 7, 2019 Paul Conforti finished a long workday and ventured to meet his pal, Michael Beals, at a local tavern. (Dkt. No. 22-3 at 74:16-76:7.)

PFOF 2.	The pair, along with another person, Randi Slomski, socialized for less than an hour before deciding to leave. (Dkt. No. 22-3 at 77:18-21.)

PFOF 3.	As they left, Beals began to have trouble breathing, and collapsed to the ground. (Dkt. No. 22-3 at 81:1-20.)

PFOF 4.	As Beals collapsed; Mr. Conforti and Slomski sprang into action, respectively calling 911 and working to make sure Beals' airway was unobstructed. (Dkt. No. 22-3 at 81:1-82:15.)

PFOF 5.	Emergency responders arrived quickly, and Mr. Conforti and Slomski accompanied Beals in the ambulance to the Ascension hospital. (Dkt. NO. 22-3 at 85:9-12.)

PFOF 6.	Mr. Conforti and Slomski accompanied Beals as he was taken from the ambulance into the emergency room, and ultimately into an exam room. (Dkt. No. 22-3 at 85:25-87:24.)

PFOF 7.	A nurse asked Conforti and Slomski to stay leave Beals' exam room because the hospital staff needed to gain control of Beals. (Dkt. No. 22-3 at 91:8-15, 93:2-4.)

PFOF 8.	While in the lobby, Conforti learned that physicians were planning on administering Ativan to Beals. (Dkt. No. 22-3 at 93:17-94:5.)

PFOF 9.	The administration of Ativan (a benzodiazepine) concerned Conforti because he knew that Beals was already taking other prescription medication. (Dkt. No. 22-3 at 93:17-94:5.)

2

PFOF 10.    With the knowledge of Beals' prescriptions, Mr. Conforti felt he had

a duty to inform someone at the facility about the other medications Beals was taking.

(Dkt. No. 22-3 at 93:17-94:19.)

PFOF 11.    Mr. Conforti tried to inform the person sitting at the front desk of

this issue, however she refused to listen to Mr. Conforti's concerns. (Dkt. No. 22-3 at 96:8-

14.)

PFOF 12.    Frustrated, Conforti left the Ascenion lobby to go home, and walked

approximately forty feet away from the doorway. (Dkt. No. 22-3 at 96:19-97:15.)

PFOF 13.    Conforti began to vape and procure an Uber ride home. (Dkt. No.

22-3 at 96:15-97:1.)

*Defendant Officers Rydelski and Wallace are Dispatched to the Ascension Hospital*

PFOF 14.    During their January 7, 2019 shift with the Franklin Police

Department, Defendants Wallace and Rydelski received a radio call regarding an unruly

patient causing a disturbance at the Ascension Hospital. (Dkt. No. 22-1 at 11:22-25, 13:11-

15; Dkt. No. 22-2 at 12:13-17.)

PFOF 15.    After receiving the call, Wallace and Rydelski drove together to the

Ascension facility and entered the emergency room. (Dkt. No. 22-1 at 14:2-7.)

PFOF 16.    Upon arrival, Wallace and Rydelski followed the sound of shouting,

and proceeded to assist FPD Officers Hernon and Burkee, who were attempting to

restrain Beals in one of the exam rooms. (Dkt. No. 22-1 at 14:11-15:21.)

PFOF 17.     In the room, the four officers tried to secure Mr. Beals. (Dkt. No. 22-1 at 15:22-16:3, 20:11-17.)

PFOF 18.     Officer Wallace heard Mr. Beals threatening to kill officers and hospital staff yet had no intention of arresting him. (Dkt. No. 22-1 at 22:23-23:11.)

PFOF 19.     While they struggled with Mr. Beals, someone entered the exam room and asked for assistance with a disturbance in the lobby. (Dkt. No. 22-1 at 25:1-11, 25:16-22; Dkt. No. 22-2 at 25:1-18.)

PFOF 20.     When the officers arrived in the lobby to respond to the disturbance, there was no disruptive person or disturbance to be found. (Dkt. No. 22-1 at 25:24-26:5; Dkt. No. 22-2 at 28:7-18.)

PFOF 21.     As the officers walked into the lobby, Slomski stated "he already left." (Dkt. No. 22-1 at 26:6-14; Dkt. No. 22-2 at 28:7-18.)

PFOF 22.     As Defendants Rydelski and Wallace exited the lobby, they did not believe they had probable cause to arrest the person who allegedly caused the disturbance. (Dkt. No. 22-1 at 26:20-27:3; Dkt. No. 22-2 at 27:22-28:6.)

PFOF 23.     When the officers left the lobby, they saw someone, 40 feet away, whose back was turned to them. (Dkt. No. 22-1 at 27:4-8; Dkt. No. 22-2 at 28:21-25; Dkt. No. 22-3 at 96:19-97:11.)

PFOF 24.     The officers moved closer to this person and saw that he was standing and using a vape. (Dkt. No. 22-1 at 28:1-8; Dkt. No. 22-2 at 29:1-7.)

PFOF 25.     The person they saw was not talking to anyone, being disruptive, or being disorderly. (Dkt. No. 22-1 at 28:9-19; Rydelski Depo 90:24-91:11.)

4

PFOF 26.    The officers never asked this person if he had a weapon. (Dkt. No. 22-1 at 58:5-11.)

PFOF 27.    Officer Rydelski believed that the person was armed because "regardless [of] what the situation dictates, [Officer Rydelski] operate[s] as if every single person has a weapon." (Dkt. No. 22-2 at 30:12-32:5, 33:6-9.)

PFOF 28.    Officer Rydelski disregards the facts he learns in any police interaction, and blindly presumes that every person he interacts with has a weapon (Dkt. No. 22-2 at 32:3-5.)

PFOF 29.    Officer Rydelski was never trained to do this. (Dkt. No. 22-2 at 32:11-13.)

PFOF 30.    Without ever announcing themselves, the first communication officers directed towards this person was a shouted command to take his hand out of his left pocket. (Dkt. No. 22-1 at 28:20-25; Dkt. No. 22-2 at 29:8-16.)

PFOF 31.    The officers had no idea if the person they were shouting at was the person who had allegedly caused a disturbance inside of the hospital lobby. (Dkt. No. 22-1 at 32:4-11.)

PFOF 32.    The person (Mr. Conforti) told the officers he was vaping, and asked why he had to take his hand out of his pocket. (Dkt. No. 22-1 at 29:2-5; 22-2 at 29:20-30:1.)

PFOF 33.    After he asked "why?" Mr. Conforti, for the first time, turned around and looked at Wallace and Ryedelski. (Dkt. No. 22-1 at 29:2-5).

PFOF 34.    The officers did not have probable cause to arrest Mr. Conforti at this point. (Dkt. No. 22-1 at 30:25-31:13, 63:19-22.)

5

PFOF 35.     Defendants' retained expert, Steve Harlow testified that it is
undisputed, that at the time the Defendant officers saw Mr. Conforti, Mr. Conforti was
peaceful outside of Ascension. (Thompson Dec. Ex. A at 50:8-11.)

PFOF 36.     The officers knew that Mr. Conforti was not committing any crime
at this point. (Dkt. No. 22-2 at 91:17-22.)

PFOF 37.     The Defendant officers increased the risk to their own safety by
encroaching on Mr. Conforti, who was peaceful. (Thompson Dec. Ex. A at 49:3-10, 50:8-
18.)

PFOF 38.     The officers never answered Mr. Conforti's question ('why?') and
instead grabbed each of Mr. Conforti's arms; Wallace grabbed Mr. Conforti's left arm,
and Rydelski grabbed the right. (Dkt. No. 22-1 at 35:25-36:5.)

PFOF 39.     After taking control of Mr. Conforti's arms, neither Officer Wallace
nor Rydelski saw anything in Mr. Conforti's left hand, weapon or otherwise. (Dkt. No.
22-1 at 36:9-19; Dkt. No. 22-2 at 36:25-37:12.)

PFOF 40.     After forcing Mr. Conforti to remove his hands from his pockets
Wallace threatened to taser Mr. Conforti, and then handcuffed him. (Dkt. No. 22-1 at
36:21-37:2.)

PFOF 41.     Defendants gained full control of Mr. Conforti through this
verbalization, the threat to use the taser. (Dkt. No. 22-1 at 59:19-60:3; Dkt. No. 22-1 at 37:9-
23; 38:4-5.)

PFOF 42.     The officers knew at this point that threatening to use a taser was an
effective control technique on Mr. Conforti. (Dkt. No. 22-1 at 38:6-10.)

6

PFOF 43. At the moment Mr. Conforti was in handcuffs, he was under arrest for disorderly conduct, and was in the custody of the Franklin Police Department. (Dkt. No. 22-2 at 38:17-25; 41:17-20; 47:4-7; 60:1-5; 90:15-23.)

PFOF 44. Mr. Conforti made no attempt to flee. (Dkt. No. 22-1 at 39:8-11.)

*Wallace and Rydelski Attack Conforti*

PFOF 45. After Defendants handcuffed Mr. Conforti, they forced him towards their police cruiser and slammed his face and body against its side. (Dkt. No. 22-3 at 125:19-126:21.)

PFOF 46. Defendants used enough force that Mr. Conforti "saw stars," moved in and out of consciousness, chipped his tooth, lacerated the inside of his mouth, and lost his glasses. (Dkt. No. 22-3 at 104:6-11, 125:19-127:6.)

PFOF 47. Mr. Conforti screamed in pain after he was thrown against the police cruiser. (Dkt. 22-3 at 110:24-112:2.)

PFOF 48. The relevant cruiser was a four-door Ford Explorer, complete with a cage and plexiglass to prevent incarcerated individuals from expelling bodily fluids or harming officers in the front seat. (Dkt. No. 22-2 at 39:9-40:5.)

PFOF 49. The back seat of the police cruiser is designed to prevent individuals from being able to harm or expel fluids at officers in the front seat. (Dkt. No. 22-2 at 40:2-10.)

PFOF 50. Officers place unruly subjects in the back seat of this cruiser. (Dkt. NO. 22-2 at 40:8-10.)

PFOF 51.     While he was against the police cruiser, and the defendant officers had Mr. Conforti's compliance, there was nothing giving the officers any concern that any part of Mr. Conforti's body may be concealing a weapon or pose a threat to the officers. (Dkt. No. 22-2 at 42:4-22, 43:25-44:3.)

PFOF 52.     At that time, the officers were able to physically restrain Mr. Conforti with just their arms and hands. (Dkt. No. 22-2 at 46:14-17.)

PFOF 53.     Mr. Conforti never spit at anyone. (Dkt. 22-3 at 112:1-2.)

PFOF 54.     While the three were against the police cruiser, and while Mr. Conforti was in handcuffs, and while Wallace had his hands on Mr. Conforti's left arm, Officer Rydelski threw Mr. Conforti face-first into the ground. (Dkt. No. 22-1 42:1-5, 45:25-46:1.; Dkt. No. 22-2 at 44:21-45:10.)

PFOF 55.     After he was thrown to the ground, Conforti did not try to run or try to grab a weapon from an officer. (Dkt. No. 22-1 at 45:18-21.)

PFOF 56.     While Conforti was cuffed, face down on the pavement, the officers were not concerned he could take their weapons. (Dkt. No. 22-1 at 46:2-9.)

PFOF 57.     While Conforti was face-down on the pavement, cuffed with his hands behind himself, both Wallace and Rydelski attacked Conforti with upwards of twenty knee strikes and punches to the head. (Dkt. No. 22-1 at 52:8-15; Dkt. No. 22-3 at 107:5-108:13.)

PFOF 58.     Defendant Wallace watched idly as Officer Rydelski delivered knee strikes to Mr. Conforti while he was cuffed and face-down on the pavement. (Dkt. No. 22-1 at 50:6-22.)

8

PFOF 59.    After delivering the repeated knee strikes, Wallace and Rydelski were able to maintain control over Conforti. (Dkt. No. 22-1 at 53:9-15.)

PFOF 60.    While Wallace and Rydelski maintained control of Conforti on the pavement, a third officer, Officer Burkee, came to their side. (Dkt. No. 22-1 at 53:9-15.)

PFOF 61.    When he arrived, Officer Burkee put a spit shield over Mr. Conforti's face. (Dkt. No 22-1 at 53:9-15.)

PFOF 62.    After Officer Burkee arrived, Rydelski delivered a series of additional knee strikes to Mr. Conforti's rib cage. (Dkt. No. 22-2 at 78:8-18.)

PFOF 63.    Defendants then put Mr. Conforti into their police cruiser.(Dkt. 22-3 at 128:3-8.)

PFOF 64.    After putting him into the squad, Defendants decided to pull him out of the police cruiser. (Dkt. 22-3 at 128:3-8.)

PFOF 65.    Conforti did nothing to provoke the Defendants into pulling him out of the police cruiser. (Dkt. No. 22-3 at 114:13-17.)

PFOF 66.    As they pulled him out of the vehicle, Defendants brought Mr. Conforti back to the ground and once again attacked Mr. Conforti. (Dkt. No. 22-3 at 128:3-15.)

PFOF 67.    Mr. Conforti believed he was going to die from the officers' attack. (Dkt. No. 22-3 at 128:3-15.)

PFOF 68.    The officers then brought Mr. Conforti to the sidewalk. (Dkt. No. 22-1 at 55:19-56:5.)

9

PFOF 69.    When the officers brought Mr. Conforti to the sidewalk, he was not actively resisting, they had control of his limbs and they had a spit shield on him. (Dkt No. 2201 at 55:21-56:9.)

PFOF 70.    The officers had to wait with Mr. Conforti for a brief period of time before "the wrap" arrived on scene to be applied onto Mr. Conforti. (Dkt. No. 22-1 at 57:1-4.)

PFOF 71.    "The wrap," is a restraint device, and is a more restrictive mode of physical force than anything Defendants had used on Mr. Conforti to this point. (Dkt. No. 22-1 at 56:11-25.)

PFOF 72.    "The wrap" constitutes a use of force. (Dkt. No. 22-1 at 92:15-22.)

PFOF 73.    Franklin Police Department requires and trains its officers that they must reduce the amount of forced used upon a subject down to the level required to gain control. (Dkt. No. 22-1 at 62:10-25.)

PFOF 74.    After "The wrap" arrived on scene, Defendants placed Mr. Conforti into it. (Dkt. No. 22-2 at 83:4-22.)

PFOF 75.    Police officers are taught that grabbing someone's arms triggers an automatic response: the arms tense up. (Thompson Dec. Ex. A at 54:8-14).

10

Dated at Madison, WI this 5th day of May, 2021

                                        GINGRAS, THOMSEN & WACHS, LLP

                                        *s/ Scott B. Thompson*
                                        Mark L. Thomsen
                                        State Bar No.: 1018839
                                        Scott B. Thompson
                                        State Bar: 1098161
                                        8150 Excelsior Drive
                                        Madison, WI 53717
                                        Email: mthomsen@gtwlawyers.com
                                                  sthompson@gtwlawyers.com

11