UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAUL R. CONFORTI,
        Plaintiff,

v.                                                       Case No. 20-C-0349

CITY OF FRANKLIN, et al.,
        Defendants.

## DECISION AND ORDER

Paul Conforti brings this action under 42 U.S.C. § 1983 against the City of Franklin, two of its police officers, and its insurer. Before me now is the defendants' motion for partial summary judgment.

### I. BACKGROUND

On the evening of January 7, 2019, the plaintiff and two friends, Michael Beals and Randi Slomski, were out socializing when Beals started to choke. The plaintiff and Slomski were able to remove the obstruction from Beals' airway and called 911. An ambulance arrived, and it was decided that Beals should be brought to the hospital. The plaintiff and Slomski rode in the ambulance with Beals to the hospital.

At the hospital, the plaintiff and Slomski accompanied Beals into the emergency department and to an exam room. While he was receiving treatment, Beals became unruly, and a nurse asked the plaintiff and Slomski to leave the room, which they did. While he was in the lobby of the emergency department, the plaintiff learned that medical staff planned to administer medication to Beals that might adversely interact with medication Beals was already taking. The plaintiff told a hospital employee sitting at the

front desk about his concerns, but the plaintiff was unsatisfied with the response he received.

At around the same time, hospital staff called the Franklin Police Department and asked for assistance with Beals. Officers Hernan and Burkee (who are not defendants) were the first to respond to the call and went into the exam room to help control Beals. Officers Gary Wallace and Christopher Rydelski (who are defendants) were also dispatched to the hospital. When they arrived, Wallace and Rydelski could hear shouting from one of the exam rooms and proceeded to that area. Hernan and Burkee told Wallace and Rydelski that Beals was being unruly and assaulting hospital staff and the officers. Burkee and Wallace also told them that Beals had two friends with him that had already been told to leave the emergency department because they were creating a disturbance. In the exam room, Wallace and Rydelski could see Beals struggling with Hernan and Burkee and heard Beals threatening to kill officers and hospital staff.

While Wallace and Rydelski were assisting Hernan and Burkee with Beals, a woman who appeared to be a nurse or other hospital employee came into the exam room and asked the officers to come to the lobby because a person (the plaintiff) was shouting and using profanities and threatening a hospital employee. Wallace and Rydelski went to the lobby to help the employee, but by the time they arrived the disturbance had ended. Slomski apparently realized that the officers were looking for the plaintiff, and he told them that the plaintiff had already left the hospital. Wallace and Rydelski went outside.

According to the plaintiff, by the time the officers were looking for him, he was standing outside, about 40 feet away from the hospital entrance. He was vaping and had just used his phone to request an Uber ride home. According to the officers, when they

2

exited the hospital, they observed the plaintiff standing near the hospital door with his back turned to them. He was the only person in the area. The officers approached the plaintiff and noticed that his hand was in his pocket. The officers claim that they announced themselves as police officers and asked the plaintiff to remove his hand from his pocket. The plaintiff denies that the officers said they were officers and claims that the first thing he heard was a command to remove his hand from his pocket. The plaintiff says that, in response to the command to remove his hand from his pocket, he asked "why" and turned around to face the officers. The parties agree that, at this point, Officer Wallace grabbed the plaintiff's left arm and Officer Rydelski grabbed his right arm. The plaintiff began shouting and became tense. In response, Wallace removed his TASER from its holster and told the plaintiff that he would be tased if he did not stop resisting. The parties agree that, once the plaintiff was warned about the TASER, he stopped resisting and allowed the officers to handcuff him.

What happened next is disputed. The plaintiff contends that, once he was handcuffed and under control, the officers violently forced him towards their police cruiser and slammed his face and body against its side. The plaintiff claims that he saw stars, moved in and out of consciousness, chipped his tooth, lacerated the inside of his mouth, and lost his glasses. The plaintiff says that, at this point, the officers threw him face-first onto the ground and pummeled him with as many as twenty knee strikes and punches to the head. Eventually, a "spit shield" was placed on the plaintiff's head, and he was placed into the back of the police cruiser. Pl. Prop. Findings of Fact ("PFOF") ¶ 61. The officers then pulled him out of the cruiser, threw him back on the ground, and continued attacking him. Eventually, they brought him to a sidewalk and waited for other officers to bring a

3

device known as "the wrap" to the scene. *Id.* ¶ 70. This is a device that officers use to restrain a subject's legs if the officers think the subject will kick them. Once the wrap arrived, the officers placed the plaintiff in it, put him in a wheelchair, and brought him back into the hospital to receive treatment for his wounds.

The defendants tell a different story. They contend that, once the plaintiff was handcuffed, they escorted him towards the squad car. At the car, the plaintiff pulled away from them, turned around, and spit on Officer Wallace's face. In response, the officers performed a "takedown maneuver" on the plaintiff to prevent him from spitting on them again. Def. PFOF ¶ 30. Once he was on the ground, the plaintiff began flailing his legs, attempted to roll over, and attempted to kick and spit on the officers. Wallace told the plaintiff to stop resisting, but the plaintiff did not relent. Wallace therefore "directed one knee-strike to [the plaintiff's] lower quadrant to gain compliance," but the plaintiff continued to resist. *Id.* ¶ 32. At the same time, Rydelski also directed "one or two" knee-strikes "to the right rib cage area" because the plaintiff continued to resist. *Id.* ¶ 33. While this was occurring, Wallace radioed for backup, and this prompted Officer Burkee to come outside and assist. Burkee grabbed the plaintiff's legs, and at that point the officers had the plaintiff under control. Burkee placed the spit shield on the plaintiff's face, and the officers brought the plaintiff to the squad car and attempted to place him in the back seat. But once the plaintiff was on the backseat he rolled over on his side and kicked Officer Wallace in the groin or thigh area. In response, the officers removed the plaintiff from the vehicle and put him back on the ground. They called for "the wrap" and placed the plaintiff in it when it arrived to prevent the plaintiff from continuing to kick them. Once the plaintiff was in the wrap, he was brought inside the hospital for treatment.

4

In the present suit, the plaintiff alleges that the actions of Wallace and Rydelski violated the Fourth Amendment. The plaintiff initially alleged that the arrest itself was unlawful, but he has since conceded that the officers are entitled to summary judgment on any claim for wrongful arrest. Pl. Br. at 23. He further concedes that the defendants are entitled to summary judgment on any claim involving the officers' conduct up to the time that they placed him in handcuffs. *Id.* However, the plaintiff contends that Wallace and Rydelski used excessive force after they handcuffed him. He further contends that each officer is liable for failing to intervene to prevent the other officer from using excessive force after the handcuffing.[1]

The defendants concede that genuine disputes of material fact prevent entry of summary judgment on the plaintiffs' claims for excessive force following the handcuffing. However, they contend that they are entitled to summary judgment on the plaintiffs' claims for failure to intervene. Thus, the only issue I need to decide is whether the defendants are entitled to summary judgment on the failure-to-intervene claims against Wallace and Rydelski.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light

---

[1] The plaintiff also sues the City of Franklin and its insurer, but he does not contend that the city is liable under 42 U.S.C. § 1983 for the conduct of Wallace and Rydelski. Instead, he joined both the city and its insurer to this action because, under state law, they may be obligated to pay any judgment entered against the officers. The defendants do not dispute that they are properly joined as defendants for this reason.

most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). A "realistic opportunity to intervene" may exist whenever an officer could have "called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005).

In the present case, the defendants contend that Wallace and Rydelski cannot be liable for failing to intervene because the plaintiff alleges that they both directly participated in the alleged uses of excessive force. In support of their contention, the defendants cite several unpublished district-court cases from outside the Seventh Circuit stating that, when an officer is a direct participant in the use of force, there can be no liability for failure to intervene. *See Cooper v. Dieungenia*, No. 14-CV-6136, 2017 WL 818637, at *8 (E.D.N.Y. Feb. 27, 2017); *Buchy v. City of White Plains*, No. 14 CV 1806, 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015); *Page v. Chambers*, No. 5:14CV00218, 2015 WL 3964675, at *4 (E.D. Ark. June 29, 2015); *Cuellar v. Love*, No. 11-cv-3632, 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014); *Shirley v. City of Eastpointe*, No. 11–14297, 2013 WL 4666890, at *10 (E.D. Mich. Aug. 30, 2013). None of these cases, however, explains why an officer who directly participates in a use of excessive force cannot also

6

be liable for failing to intervene to prevent another officer from also using excessive force. In each case, the court either baldly asserts that a direct participant cannot be liable on a failure-to-intervene theory or does nothing more than cite one of the other cases baldly asserting this proposition.

Moreover, I can see no reason why an officer who uses excessive force cannot also be liable for failing to intervene to prevent another officer from using excessive force. There are only two elements to a failure-to-intervene claim: (1) the officer must have reason to know that excessive force is being used; and (2) the officer must have had a realistic opportunity to intervene to prevent the excessive force from occurring. *Yang*, 37 F.3d at 285. An officer who uses excessive force on a suspect could know that another officer is also using such force and could have a realistic opportunity to prevent that officer from continuing to use that force. Indeed, under the plaintiff's version of the facts, that is what happened here. Under the plaintiff's version, both officers threw him on the ground while he was handcuffed and docile and then jointly administered a series of twenty kicks and punches to his body. The defendants concede that there is a genuine factual dispute over whether this happened, and they do not dispute that, if it did happen, the officers both used excessive force. If both officers used excessive force, a jury could reasonably find that they each failed to intervene to prevent the other officer from kicking and punching the plaintiff, for an officer who actively kicks and punches a suspect has a realistic opportunity to prevent the other officer from simultaneously kicking and punching the same suspect. Simply put, instead of joining in the use of force, the officer could have restrained his partner "or at least cautioned [him] to stop." *Yang*, 37 F.3d at 285. Thus, Officers Wallace and Rydelski could each be liable for both the injuries that the plaintiff

7

suffered from his own use of force and the injuries the plaintiff suffered from the other officer's use of force.

As a practical matter, however, it seems unlikely that the plaintiff needs to pursue his failure-to-intervene claims. The plaintiff alleges that each officer actively participated in each alleged use of excessive force, and neither officer denies being involved in these events. No party appears poised to ask the jury to identify precisely how the plaintiff suffered each of his injuries and decide which officer applied the exact force that caused each distinct injury. Instead, the jury will be asked to decide whose version of the facts is true. If the jury believes the plaintiff's claim that he was under control once he was handcuffed and did not try to kick or spit on the officers, then both officers will be liable for using excessive force and will be jointly liable for all the injuries the plaintiff suffered after he was handcuffed. The plaintiff cannot recover twice for the same injuries, *see Duran v. Town of Cicero*, 653 F.3d 632, 642 (7th Cir. 2011), and so if the jury finds for the plaintiff on the excessive-force claims, the failure-to-intervene claims will be redundant. Similarly, "if there was no excessive force then there can be no failure to intervene," *Abdullahi*, 423 F.3d at 767–68, and so if the jury finds that all the force used after the handcuffing was justified, the failure-to-intervene claims will also fail. Still, even if the failure-to-intervene claims are unnecessary, they are not legally defective. Thus, while I will encourage the plaintiff to simplify the issues at trial by not pursuing the redundant failure-to-intervene claims, I cannot grant summary judgment on those claims.

Officers Wallace and Rydelski also claim that they are entitled to qualified immunity. Qualified immunity shields government officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a

8

reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In evaluating a law enforcement officer's entitlement to qualified immunity, a court asks whether the officer's conduct violated a constitutional right and, if so, whether that right was clearly established at the time of the alleged violation. *Lopez v. Sheriff of Cook County*, 993 F.3d 981, 988 (7th Cir. 2021). I have already determined that each officer's failure to intervene would amount to a constitutional violation if the jury resolved the material factual disputes in the plaintiff's favor, and so the only remaining issue is whether the law was clearly established.

The defendants contend that they are entitled to qualified immunity "because there is no clearly established law indicating that officers may be held liable for failing to intervene in the alleged conduct when they directly participated in the conduct." Br. in Supp. at 21. But in the Seventh Circuit, the elements of a claim for failing to intervene have been clearly established since at least 1994, *see Yang*, 37 F.3d at 285, and as I have explained, those elements do not imply that an officer who uses excessive force cannot also be liable for failing to intervene in another officer's use of excessive force on the same suspect. It is true that the handful of unpublished, out-of-circuit district-court cases cited by the defendants assert that a direct participant in a use of force cannot also be liable for failing to intervene, but these few cases do not prevent the law from being clearly established in the Seventh Circuit. *See Burgess v. Lowery*, 201 F.3d 942, 944–45 (7th Cir. 2000) (noting that whether case is clearly established depends on the overall state of the law).

Moreover, I doubt that any of the defendants' cases could reasonably be interpreted to mean that, if an officer has a realistic opportunity to intervene to stop

9

another officer's use of excessive force, and instead of intervening the officer decides to use excessive force of his own, then he is not liable for the injuries inflicted by the other officer. Such an interpretation would lead to perverse results. For example, an officer who fails to intervene to prevent his partner from repeatedly striking a suspect in the head with a baton could avoid liability for the suspect's resulting head injuries by striking the suspect's leg and causing a small bruise. This could not have been the result the other district courts had in mind, and only a "plainly incompetent" officer could think that this was the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). Instead, what the other district courts likely meant in stating that a direct participant in excessive force is not liable for failing to intervene is that the plaintiff cannot recover twice for the same injury: once on an excessive-force theory and once on a failure-to-intervene theory. *See, e.g., Page*, 2015 WL 3964675, at *4 (describing failure to intervene as "an alternate theory of liability"). And, as noted above, I agree with that point and will not allow the plaintiff to recover on both theories.

In short, the defendants are not entitled to summary judgment on the plaintiff's failure-to-intervene claims.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that summary judgment is entered on the plaintiff's claims for false arrest and any claims relating to the officers' conduct up through the time the plaintiff was

10

Case 2:20-cv-00349-LA   Filed 09/13/21   Page 10 of 11   Document 30

handcuffed. The motion is denied to the extent that the plaintiff's claims for failure to intervene are not dismissed.

Dated at Milwaukee, Wisconsin, this 13th day of September, 2021.

s/Lynn Adelman  
LYNN ADELMAN  
United States District Judge