UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAUL R. CONFORTI,

        Plaintiff,                        CASE NO. 20-CV-349

HUMANA CARESOURCE,
ABC INSURANCE COMPANY,

        Involuntary Plaintiffs,

v.

CITY OF FRANKLIN,
CHRISTOPHER RYDELSKI,
GARY WALLACE,
LEAGUE OF WISCONSIN MUNICIPALITIES
MUTUAL INSURANCE,

        Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO EXCLUDE CONFORTI'S POLICE PRACTICES EXPERT, ROGER CLARK**

City of Franklin, Officer Christopher Rydelski, Officer Gary Wallace, and League of Wisconsin Municipalities Mutual Insurance, by their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., respectfully submit the following Brief in Support of their Motion to Exclude Conforti's Police Practices Expert, Roger Clark.

**BACKGROUND**

A.    **Undisputed Facts – Events Before Conforti was Escorted to the Squad-Car.**

City of Franklin Police Department ("FPD") Officer Gary Wallace and Officer Christopher Rydelski were dispatched to Ascension Hospital shortly before midnight on January 7, 2019 to help two other police officers (Officer Hernan and Officer Burkee) control an unruly

1

patient (Michael Beals). The patient's friend, Paul Conforti, was at the hospital that evening. When Officer Wallace and Officer Rydelski arrived at the hospital, they went to Beals' hospital room and, among other things, were told that Conforti had already been asked to leave the hospital because he was creating a disturbance.

While Officer Wallace and Officer Rydelski were attempting to control Beals, a hospital employee "came running into the [patient's] room shouting that [] officers needed to go to the front lobby" because Conforti was shouting profanities and threatening hospital staff in the lobby. Officer Wallace and Officer Rydelski rushed to the lobby and were told that Conforti had just exited the building. The officers then went outside, noticed Conforti standing nearby, and started approaching him. Conforti's hand was inside his pocket at that time and the officers therefore ordered Conforti to remove his hand from his pocket for officer safety reasons. Conforti refused those orders, started shouting at the officers, and resisted when the officers grabbed his arms. Officer Wallace then warned Conforti he would use a TASER if he did not stop resisting, and Conforti then stopped resisting and was handcuffed.

**B. Disputed Facts – Events After Conforti was Escorted to the Squad-Car.**

The parties dispute what happened after Conforti was handcuffed and escorted to the squad-car. Conforti claims that Officer Wallace and Officer Rydelski slammed his face against the squad-car immediately after they approached the vehicle. Conforti testified the officers then tackled him (twice), held his face on the concrete, and repeatedly kneed and punched him in his body and head (between 20 and 40 times). Conforti maintains that he never resisted the officers, and that he did not engage in any conduct that required the use of force.

Officer Wallace and Officer Rydelski claim they escorted Conforti to the squad-car and then began conducting a pat-down. The officers testified that Conforti pulled away during the

2

Case 2:20-cv-00349-LA    Filed 03/07/22    Page 2 of 14    Document 57

pat-down, turned his head towards Officer Wallace (who was conducting the pat-down), and spit on Officer Wallace's face. Officer Wallace and Officer Rydelski therefore brought Conforti to the ground to gain control and prevent him from spitting on them again. The officers testified that, while on the ground, Conforti actively resisted by shouting and flailed his legs, by attempted to roll over, and by attempting to kick them. Officer Rydelski testified that Conforti also spit on him while they were on the ground.

Officer Wallace claims that he repeatedly ordered Conforti to stop resisting while on the ground, that Conforti refused to comply, and that he therefore directed a knee-strike to Conforti's lower quadrant in an attempt to gain compliance (which was ineffective). Office Wallace testified that he also requested backup over his police radio at that time. Officer Rydelski claims he also directed one or two knee-strikes to Conforti's "right rib cage area" in an attempt to gain compliance.

Shortly thereafter, a backup officer (Officer Burke) arrived (from inside the hospital) and grabbed Conforti's legs, and Conforti then stopped resisting. The officers therefore assisted Conforti off the ground, searched him, and attempted to place him in the squad-car. Officer Wallace and Officer Rydelski claim that Conforti actively resisted at that time, and that Conforti kicked Officer Wallace in the groin at that time. The officers testified that they removed Conforti from the squad-car at that time and held him on the ground while they waited for backup to arrive with a WRAP device. The officers claim they used the WRAP device to prevent Conforti from kicking officers (again) and/or hospital staff, and that Conforti was then wheeled back inside the hospital to be medically cleared for incarceration.

The only claims that remain for trial, and that have not been dismissed, are (1) Fourth Amendment individual capacity claims against Officer Wallace and Officer Rydelski relating to

the amount of force they after Conforti was handcuffed and escorted to the squad-car; and (2) individual capacity failure-to-intervene claims against Officer Wallace and Officer Rydelski relating to the use of such force.

## RELEVANT OPINIONS

Conforti retained Roger Clark as his police practices expert in this case. Clark prepared a written report that includes the following opinions regarding the limited claims at issue for trial—whether Officer Wallace or Officer Rydelski violated the Fourth Amendment by using excessive force *after* Conforti was handcuffed and escorted to the squad-car, and, if so, whether they failed to intervene to prevent the same:[1]

- "Assuming arguendo, that Mr. Conforti spit on Officer Rydelski and/or Officer Wallace then, because he was handcuffed and restrained, nothing further than placing him inside the patrol unit was necessary - nothing further." (Reginato Aff., Ex. 2, Clark Report, p. 3.)

- Accordingly, the officers conduct, decentralizing Mr. Conforti to the ground, pressing his face into the pavement, repeatedly striking him while he was on the ground and subdued, and then placing him in a spit hood and wrap, was [a] violation of core policing practices, policies, and trainings. (Id., p. 3.)

- "There were many opportunities for either Officer to prevent the other from continuing or escalating their conduct. Given these opportunities, each officer, under the standard training, policy, and practices applicable to police officers, had a duty to prevent any infliction of unnecessary harm upon Mr. Conforti." (Id., p. 3.)

## ARGUMENT

**I.    STANDARD GOVERNING THE ADMISSIBILITY OF EXPERT EVIDENCE.**

The decision to exclude expert evidence is left to the sound discretion of the district court. *Bradley v. Brown*, 42 F.3d 434, 436 (7th Cir. 1994). Federal Rule of Evidence 702 and

---

[1] Clark's report includes opinions regarding the events that occurred before Conforti was handcuffed and escorted to the squad-car, which have been dismissed as a matter of law and which are not at issue for trial. Those opinions should be excluded for the reasons explained in Defendants' Motion in *Limine* No. 7. His report also includes numerous legal conclusions which are inadmissible for the reasons explained in Defendants' Motion in *Limine* No. 2.

*Daubert* govern the admissibility of such evidence. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 594–95 (1993).

Fed. R. Evid. 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A district court must function as a "gatekeeper" to ensure the proposed expert evidence is relevant and reliable. *Daubert*, 509 U.S. at 589. To do so, a court should utilize the following three-prong analysis: (1) determine if the expert is properly qualified; (2) determine if the reasoning and/or methodology behind the expert's opinions are scientifically reliable; and (3) determine if the expert's opinions would help the jury understand the evidence or determine a fact. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). The plaintiff must prove each prong of the admissibility analysis. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

With respect to the first prong, a court should evaluate the expert's "full range of practical experience as well as academic or technical training" to determine if he is qualified to provide the proffered opinion. *U.S. v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999).

With respect to the second prong, expert evidence is "admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff –

deploying neither data nor analysis – is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir. 2000). *Daubert* provides a non-exhaustive list of factors to be used in determining the soundness of an expert's methodology, including: whether the theory can be or has been tested; whether the theory has been subjected to peer review and publication; the theory's known or potential error rate when applied; and whether the theory has been generally accepted in the relevant scientific, technical or professional community. *Daubert*, 509 U.S. at 593.

With respect to the third prong, a court must confirm expert evidence is relevant; that is, the testimony and/or opinions must "assist the trier of fact to understand the evidence or to determine a fact at issue." *Ervin*, 492 F.3d at 904. Relevant evidence "make[s] the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert*, 509 U.S. at 587. Finally, the court must verify the probative value of the expert evidence is not substantially outweighed by the danger of unfair prejudice, or by the risk of misleading the jury. *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 900 (E.D. Wis. 2010).

## II. THE COURT SHOULD PRECLUDE ANY TESTIMONY AND/OR OPINIONS FROM ROGER CLARK.

The Court should preclude Clark from offering any testimony and/or opinions because they are based on faulty and incomplete data, they are not based on Wisconsin law enforcement standards, and they are devoid of any expert analysis.

### A. Clark's Opinions Are Based on Faulty and Incomplete Data.

Expert testimony and opinions should be excluded from trial if they are based on incomplete and/or faulty data. *See Fail–Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp.2d 870, 889 (E.D. Wis. 2010) ("[I]t is readily apparent that Dr. Keegan all but 'cherry picked' the data he

6

Case 2:20-cv-00349-LA    Filed 03/07/22    Page 6 of 14    Document 57

wanted to use, providing the court with another strong reason to conclude that the witness utilized an unreliable methodology.").

Clark understands that "all the circumstances surrounding the use of force must be considered to determine whether an officer's conduct was appropriate or excessive." (Reginato Aff., Ex. 1, Clark Depo., p. 13.) Nevertheless, Clark formulated his opinions in this case without reviewing, and without considering, the most concrete evidence—the squad-car footage and recorded audio. Clark was never even provided with such evidence. (Reginato Aff., Ex. 1, Clark Depo., p. 28) ("Q. Okay. Did you review any of that video footage [from the squad-car]? A. No. Q. Is there a reason why you didn't? A. I didn't know it existed. Q. What about audio? Did you review any audio from the [] microphones of the officers? A. Well, no. That [] recording was not available to me.").

The video footage depicts material circumstances which must be considered – as part of the "totality of the circumstances" – to formulate expert opinions regarding the use of force.

For example, the video footage shows that Officer Wallace and Officer Rydelski attempted to place Conforti in the squad-car before they used the WRAP device. It also shows that Conforti actively resisted and kicked Officer Wallace in the groin at that time. (Reginato Aff., Ex. 3, Letter to Court, Wallace/Rydelski Video, Time: 23:48.) The video footage also shows that – after Conforti kicked Officer Wallace in the groin – the officers removed him from the squad-car, held him on the ground, and waited for backup to arrive with the WRAP device. This was done to prevent Conforti from damaging the squad-car and kicking officers (again).

Clark failed to consider any of the foregoing events because he did not review the video footage, and because he instead relied on the allegations included in the Complaint (which omit

7

the foregoing events). Indeed, Clark's report does not mention any of the foregoing events or Conforti's resistive, threatening, and dangerous behavior at that time:

> Then, Officer Burkee placed a spit hood on Mr. Conforti. (Wallace Depo. 53:9-15.) Officer Wallace testified that at this moment (while Mr. Conforti was in handcuffs, face down on the pavement, and wearing a spit hood) Officers Rydelski and Wallace had overcome any active resistance they perceived from Mr. Conforti. (Wallace Depo. 53:16-21). Regardless, Officers Rydelski and Wallace increased the amount of force they were using, and forced Mr. Conforti into total body restraint device known as a WRAP. (Wallace Depo. 56:11-25.) The officers admit that this device is more restrictive than any other tactic they used on Mr. Conforti.

(Reginato Aff., Ex. 2, Clark Report, p. 11); (Reginato Aff., Ex. 1, Clark Depo., p. 92) (admitting that his opinions are based on the allegations included in the Complaint, which do not mention any of the foregoing events).

According to Clark, a blow/kick to the groin is considered a "high level of force," is "extremely dangerous," and can result in "deadly consequences." (Id., p. 85) ("Q. Is it your opinion that a blow to the groin is something that should be considered extremely dangerous? A. Yes.") (id.) ("Q. Is it your opinion that a blow to the groin can result in serious injury or death? A. Yes."); (Reginato Aff., Ex. 2, Clark Report, p. 14-15) (same).

The video footage also shows there were no strikes/blows used when the officers removed Conforti from the squad-car, or while they waited for the WRAP device. (Reginato Aff., Ex. 3, Wallace/Rydelski Video, Time: 23:48; Goers Video, Time: 23:48.) Again, Clark failed to consider those circumstances because he did not review the video footage, and because he instead relied on the allegations included in the Complaint (which omit the same):

> Q. [Is] it fair to say you don't know whether the officers used any strikes against Mr. Conforti after they removed him from the vehicle?
> A. Only from his complaint and his deposition - - now his deposition….
> Q. And you didn't review any of the other squad car videos that showed the footage of Mr. Conforti on the ground before he was placed in a [] wrap, and after

> he was removed from the car, between that point in time; you didn't review any of that video, correct?
>
> A. I have not seen that video if it exists.

(Reginato Aff. Ex. 1, Clark Depo., p. 102-103.)

With respect to the audio recording, it reveals that Conforti was shouting and being verbally abusive/threatening towards Officer Wallace and Officer Rydelski during the entire incident. Because Clark did not review the audio, his opinions fail to account for those circumstances.

In sum, Clark formulated his opinions without considering the totality of the circumstances, including resistive and "extremely dangerous" behavior from Conforti which is depicted in the video footage and audio recordings, and that cannot be disputed. His opinions are therefore based on incomplete data, are unreliable, and should therefore be excluded from trial. (Id., p. 13) (acknowledging that "how the suspect is or was behaving" and "what the suspect is saying and how he was saying it" are critical circumstances that must be considered when forming opinions regarding the use of force).

Finally, there are various examples where Clark relied on data that is plainly incorrect. For instance, Clark's report indicates "[i]t is uncontested (per the testimony of both Officers Rydelski and Wallace) that the physical force inflicted on Mr. Conforti by Officers Rydelski and Wallace included … slammed against a police vehicle." (Reginato Aff., Ex. 2, Clark Report, p. 13); (Reginato Aff., Ex. 1, Clark Depo., p. 81) ("Q. Is it your understanding that [the officers] testified that they slammed Mr. Conforti against the car? A. That was my understanding in terms of their report, as well as their testimony [] in their deposition."). This is incorrect, and Clark admits the same. (Id., p. 82) (admits this fact is not "uncontested," but "heavily contested"). As another example, Clark's report indicates it is uncontested that Officer Wallace and Officer

Rydelski used "blows to the head" against Conforti. (Reginato Aff., Ex. 2, Clark Report, p. 14.) This is also incorrect. The officers both testified they did not direct any "blows" to the head. As another example, Clark's report indicates "it is uncontested" that Conforti was "fully subdued" after he was "placed [] in a spit hood." (Id., p. 15.) This is also incorrect. The video footage (which Clark failed to review) **cannot be disputed** and proves that Conforti continued resisting, and kicked Officer Wallace in the groin, when the officers attempted to place him in the squad-car (which occurred after the spit-hood was placed over his head). *Andrews v. E.I. Du Pont De Nemours & Co.*, 447 F.3d 510, 513 (7th Cir. 2006) (expert evidence excluded because "expert based his calculations on data from the wrong highway ramp"); *Goss v. JLG Indus., Inc.*, 2012 WL 268034, at *9 (W.D.N.Y. Jan. 30, 2012) (excluding opinion excluded because of expert's "misunderstanding of some of the documents involved in this case").

    **B.    Clark's Opinions are Not Based on Wisconsin Law Enforcement Standards and Are Devoid of Any Expert Analysis.**

A court must ensure expert opinions "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. In other words, an expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *Mamah*, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert.").

The Seventh Circuit has reiterated that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.*, 395 F.3d at 419-20.  Nor is it sufficient for an expert to simply assert his opinions, techniques or conclusions are "reliable" and based on appropriate experience, training and expertise.  *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").

Clark acknowledges the Wisconsin Law Enforcement Standards Board oversees police training and certification in Wisconsin and provides the applicable policing standards and requirements in Wisconsin.  (Reginato Aff., Ex. 1, Clark Depo., p. 46.)  Those standards and requirements are found in the Wisconsin Defensive and Arrest Tactics (DAAT) Manual, which is provided to all police officers in Wisconsin, and which used to train all police officers in Wisconsin on the use of force.  Indeed, Clark testified that he relied on the DAAT Manual in his prior Wisconsin cases to determine the appropriate use of force standards, and to provide opinions regarding the same:

> Q. Why did you look at the [DAAT standards and manual] in the *DiPiazza* case?
> A. Well, I think if you know the case, it's obvious….
> Q. Okay. So why was it important to look at the DAAT Manual in that case?
> A. Because it was important to be able to express to the jury during the trial that it was contrary using the training given by DAAT to shoot her.

(Id., p. 59.)

Although Clark relied on the DAAT Manual to formulate his opinions in his other cases regarding the use of force standards in Wisconsin, he chose not to rely on the Wisconsin DAAT Manual and standards to form his opinions in this case.  In fact, Clark admits he did not discuss or cite to any Wisconsin standards in his report.  (Id., p. 40) ("Q. Did you look at any of the DAAT Manuals to formulate your opinions in this case? A. No."); (Id., p. 41:9-17) ("Q. You

don't cite to any DAAT standards, or to the DAAT Manual in your report, is that correct? A. That's correct. Q. [And] the materials your reviewed, or used in preparation to prepare your report, [] you didn't list the DAAT Manual, is that correct. A. You are correct.")[2]

Clark also admits he has no formal training regarding the Wisconsin DAAT Manual or standards. (Id., p. 46:18-25; 83:16-20.) Nor does Clark know if Officer Wallace or Officer Rydelski were trained under standards from different states (such as Virginia, California, Arizona, or Nevada. (Id., p. 47:1-6.) In fact, Clark testified that his knowledge and understanding of the Wisconsin DAAT standards regarding the use of knee-strikes – the primary force at issue here – is limited to "what was quoted in Harlow's [Defendants' police practices expert] report." (Id., p. 57.)

Finally, Clark's testimony and opinions should be precluded from trial because they are completely devoid of any expert analysis. Clark testified his opinions are based on the fact that "the use of force has to be appropriate under the circumstances as we discussed way earlier in the deposition." (Id., p. 107:10-16); (id., p. 110) ("Q. Is there anything in the [other state's standards] that requires officers to do that in this type of situation? A. Yes. It is. It's called reasonable force. And it is a professional standard."). There is no need for Clark to explain what legal standard governs the use of force at trial (i.e., the objective reasonableness standard).[3] The Court, not Clark, will provide the jury with those standards. Nor is there a need for Clark to

---

[2] During his deposition, Clark testified that he relied on the standards and requirements from different states and was inconsistent and evasive regarding such testimony. At one point, Clark claimed he relied on the standards from Virginia, (id., p. 35:18), while at other points he indicated he relied on the standards from California, (id., p. 37:9-11), Arizona, (id., p. 37:20), and Nevada, (id.). In any event, Clark's report does not include, discuss, or cire to any standards from any states.

[3] It should also be noted that the legal standards included in Clark's written report are incorrect, and do not reflect how police officers are trained in Wisconsin. For example, Clark's written report indicates that "law enforcement officers are trained that they are authorized to arrest a suspect when they have a set of facts, including an honest and strong suspicion, that the suspect is guilty of a crime. This typically includes in the case of misdemeanors that the officer must observe the crime occur." (Reginato Aff., Ex. 2, Clark Depo., p. 12.) This does not reflect the status of Wisconsin law or the law enforcement training standards in Wisconsin, which allows a felony or misdemeanor arrest to be made based on probable cause, regardless of whether the officer observes the crime.

apply the facts to the applicable legal standard, or to offer a legal conclusion at trial regarding whether the use of force was "appropriate under the circumstances." The jury, not Clark, will make this determination.

Courts have routinely precluded expert opinions that are based on "my expertise," rather than the applicable and articulable industry standards. *See Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190 (C.D. Cal. 2015) (Barring Clark from providing legal conclusions, and from testifying the officer was "the instigator," or that the officer escalated the incident and caused the need for force.); *LeDonne v. AXA Equitable Life Ins. Co*., 2009 WL 2526453, *4 (N.D. Ill. Aug. 14, 2009) (Excluding opinion where expert "offered no explanation of what industry standards he's talking about, what they are, how [defendant] fell short of compliance, etc.")*; Reyes v. Delta Dallas Alpha Corp*., 2000 WL 526851, *3 (S.D.N.Y. May 2, 2000) (Excluding expert opinion where "there is no evidence that [the expert] relies on anything more than common sense guidelines, as opposed to industry standards."); *Wells v. Chicago*, 2012 WL 116040 (N.D. Ill., 2010) (striking police expert opinions because, among other things, he failed to compare facts of case with standard law enforcement practices); *Minasian v. Standard Chartered Bank*, PLC, 109 F.3d 1212, 1216 (7th Cir. 1997) (expert opinions that merely set forth conclusions, without any basis of reasonable analysis, do not assist the jury); *Grdinich v. Bradlees*, 187 F.R.D. 77 (S.D.N.Y. 1999) (excluding opinions that are not supported by industry practices or standards); *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (For expert evidence to be admissible, "there [must] be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support."); *Gen. Elec. V. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing only by the *ipse dixit* of the expert.").

**CONCLUSION**

For these reasons, City of Franklin, Officer Christopher Rydelski, Officer Gary Wallace, and League of Wisconsin Municipalities Mutual Insurance respectfully ask the Court to Grant their Motion to Exclude All Testimony and Opinions from Conforti's Police Practices Expert, Roger Clark.

Dated this 7th day of March, 2022.

                    **MUNICIPAL LAW & LITIGATION GROUP, S.C.**
                    Attorneys for City of Franklin, Officer Christopher Rydelski, Officer Gary Wallace and League of Wisconsin Municipalities Mutual Insurance.

                    By:    */s/ Electronically signed by Matteo Reginato*
                           REMZY D. BITAR
                           State Bar No: 1038340
                           MATTEO REGINATO
                           State Bar No: 1089724

                           730 N. Grand Avenue
                           Waukesha, WI 53186
                           O: (262) 548-1340
                           F: (262) 548-9211
                           E:      rbitar@ammr.net
                                    mreginato@ammr.net