UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAUL R. CONFORTI,
        Plaintiff,

v.                                      Case No. 20-C-0349

CITY OF FRANKLIN, et al.,
        Defendants.

## DECISION AND ORDER

Paul Conforti brings this action under 42 U.S.C. § 1983 and alleges that two City of Franklin police officers used excessive force during an arrest. The case is set for a jury trial. This order addresses several of the parties' motions in limine, including the defendants' motion to exclude the testimony of the plaintiff's police-practices expert, Roger Clark.

## I. BACKGROUND

On the evening of January 7, 2019, the plaintiff and two friends, Michael Beals and Randi Slomski, were out socializing when Beals started to choke. The plaintiff and Slomski were able to remove the obstruction from Beals' airway and called 911. An ambulance arrived, and it was decided that Beals should be brought to the hospital. The plaintiff and Slomski rode in the ambulance with Beals to the hospital.

At the hospital, the plaintiff and Slomski accompanied Beals into the emergency department and to an exam room. While he was receiving treatment, Beals became unruly, and a nurse asked the plaintiff and Slomski to leave the room, which they did. Hospital staff called the Franklin Police Department and asked for assistance with Beals. Officers Hernan and Burkee (who are not defendants) were the first to respond to the call

and went into the exam room to help control Beals. Officers Gary Wallace and Christopher Rydelski (who are defendants) were also dispatched to the hospital. When they arrived, Wallace and Rydelski could hear shouting from one of the exam rooms and proceeded to that area. Hernan and Burkee told Wallace and Rydelski that Beals was being unruly and had assaulted hospital staff and the officers. In the exam room, Wallace and Rydelski could see Beals struggling with Hernan and Burkee and heard Beals threatening to kill officers and hospital staff.

Meanwhile, in the lobby of the emergency department, the plaintiff had gotten into an argument with hospital staff. While Wallace and Rydelski were assisting Hernan and Burkee with Beals, a woman who appeared to be a nurse or other hospital employee came into the exam room and asked the officers to come to the lobby because the plaintiff was shouting, using profanities, and threatening a hospital employee. Wallace and Rydelski went to the lobby to help the employee, but by the time they arrived the disturbance had ended. Wallace and Rydelski went outside to look for the plaintiff.

Outside the hospital entrance, the officers saw the plaintiff and approached him. As they approached, they commanded the plaintiff to remove his hand from his pocket. The plaintiff asked "why" and turned around to face the officers, but he did not remove his hand from his pocket. Officer Wallace then grabbed the plaintiff's left arm and Officer Rydelski grabbed his right arm. The officers state that they intended to detain the plaintiff for further investigation. The plaintiff began shouting and became tense. Wallace removed his TASER from its holster and told the plaintiff that he would be tased if he did not stop resisting. The parties agree that, once the plaintiff was warned about the TASER, he stopped resisting and allowed the officers to handcuff him.

What happened next is disputed. The plaintiff contends that, once he was handcuffed and under control, the officers violently forced him towards their squad car and slammed his face and body against its side. The plaintiff claims that he saw stars, moved in and out of consciousness, chipped his tooth, lacerated the inside of his mouth, and lost his glasses. The plaintiff contends that, at this point, the officers threw him face-first onto the ground and pummeled him with as many as twenty knee strikes and punches to the head. Eventually, a spit shield was placed on the plaintiff's head, and the officers placed him into the back of their squad car. According to the plaintiff, the officers then pulled him out of the squad car, threw him back on the ground, and continued attacking him for no reason. Eventually, they brought him to a sidewalk and waited for other officers to bring a device known as "the wrap" to the scene. This is a device that officers use to restrain a subject's legs if the officers think the subject will kick them. Once the wrap arrived, the officers placed the plaintiff in it, put him in a wheelchair, and brought him back into the hospital to receive treatment for his wounds.

The defendants will testify to a different version of events. They contend that, once the plaintiff was handcuffed, they escorted him towards the squad car with the intent to place him in the backseat for questioning. Officer Wallace will testify that, when they arrived at the car, Wallace tried to search the plaintiff for weapons. Wallace contends that, while he was searching the plaintiff, the plaintiff turned his head towards him and spit saliva directly onto his face. Once the spitting occurred, the officers decided that they did not have control of the plaintiff and needed to "decentralize" him, which is a term that means bringing a subject to the ground. The officers will testify that, once the plaintiff was on the ground, he continued to try to spit on them and began trying to kick them. Because

3

the plaintiff continued to resist, each officer delivered knee strikes to the plaintiff in an attempt to overcome his resistance. Wallace delivered knee strikes to the plaintiff's lower body, and Rydelski delivered them to his rib cage. While this was occurring, Wallace radioed for backup, and Officer Burkee came outside to assist. Burkee grabbed the plaintiff's legs, and at that point the officers had the plaintiff under control. One of the officers placed the spit shield on the plaintiff's face. The officers then attempted to place him in the backseat of the squad car. But as soon as the plaintiff was on the backseat he rolled to the side and kicked Officer Wallace in the groin or thigh area. A video taken by a camera inside the squad car shows the plaintiff attempting to kick one of the officers. One of the officers can be heard grunting immediately after the plaintiff lashes out with his leg. Concluding that they still did not have the plaintiff under control, the officers removed him from the vehicle and pinned him on the ground next to the squad car. The officers then called for a device known as "the wrap," which is used to wrap a subject's legs together to prevent them from kicking. Once the plaintiff was in the wrap, the officers determined that he was under control. They put the plaintiff in a wheelchair and brought him inside the hospital for treatment. By this point, the officers had decided to arrest the plaintiff for resisting arrest and for violating a state law that makes it a felony to discharge bodily fluids at an officer.

At trial, the plaintiff will argue that Wallace and Rydelski violated the Fourth Amendment by using excessive force during the above events. Previously, the plaintiff had alleged that the arrest itself was unlawful, but the plaintiff has since conceded that the defendants are entitled to summary judgment on his claim that the officers did not have reasonable suspicion or probable cause to detain or arrest him. (ECF No. 24 at 23.)

4

Case 2:20-cv-00349-LA    Filed 04/20/22    Page 4 of 19    Document 83

The plaintiff also conceded that the defendants were entitled to summary judgment on any claim that the officers used excessive force prior to when he was placed in handcuffs. (*Id.*) Thus, the jury in this case will not be asked to assess whether Officers Wallace and Rydelski violated the Fourth Amendment when they did any of the following: approached the plaintiff, ordered him to remove his hand from his pocket, grabbed his arms, threatened to use the TASER on him, and handcuffed him. However, the plaintiff will argue that the following acts by the officers amounted to excessive force: throwing him against the squad car, decentralizing him to the ground while he was handcuffed, holding his face against the concrete, administering knee strikes to his torso, placing him in a spit hood, and placing him in the wrap. (ECF No. 62 at 12.)

In support of his claims, the plaintiff intends to introduce expert testimony from a police-practices expert, Roger Clark. Clark generally opines that the force used by Wallace and Rydelski was "inconsistent with core policing practices, policies, and training and constituted the unlawful use of excessive force." (ECF No. 58-1 at 1.) The defendants have filed a motion in limine seeking to exclude his testimony. I address this motion, along with several related motions in limine, below.

## II. DISCUSSION

Federal Rule of Civil Procedure 702 allows a witness who is qualified as an expert to testify in the form of an opinion or otherwise if: (a) the expert's specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case. Besides Rule 702, other rules of evidence are relevant to the

5

present motions, including Rules 401 and 402, which govern relevance, and Rule 403, which provides that relevant evidence may be excluded when its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

To evaluate whether Clark's testimony is admissible, I start by summarizing the relevant Fourth Amendment principles that the jury will need to apply. The Fourth Amendment "prohibits law-enforcement officers from using excessive force during an arrest as a necessary corollary of the Amendment's prohibition of unreasonable seizures." *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). When an officer is accused of using excessive force, the decisive question is whether the officer's conduct meets the Fourth Amendment's objective standard of reasonableness. *Id.* Objective reasonableness is "not capable of precise definition or mechanical application." *Id.* (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005)). Rather it "turns on the facts and circumstances of each particular case." *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). Ultimately, "the officer flunks the test if, in light of the circumstances, he 'used greater force than was reasonably necessary to effectuate the seizure.'" *Id.* (quoting *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015)).

In the present case, Clark offers two kinds of opinions. The first kind consists of statements in which Clark generally opines, based on his view of the evidence, that the force applied by one or both of the defendants was excessive, unreasonable, or unjustified under the totality of the circumstances. For example, Clark opines that "[u]nder

6

the totality of the circumstances, and the de minimis level of threat posed by Mr. Conforti when he was arrested, there are no facts in the record which would justify the level of force used by Officers Wallace and Rydelski." (Clark Report at 12; ECF No. 58-1.) Another example of this kind of opinion is the following: "I see nothing in this set of facts that would justify any force beyond simple officer presence and verbal skills during the encounter." (*Id.* at 14.) In the second kind of opinion, Clark opines that the force applied by one or both of the defendants was contrary to law-enforcement training standards. For example, after reciting his view of the facts, Clark opines that "[a]ll of this evidence further confirms that Officer Wallace's conduct violated core policing standards, practices, policies, and his trainings." (*Id.* at 15.)

Opinions of the first kind come dangerously close to being inadmissible as pure legal opinions. Although an opinion is not inadmissible "just because it embraces an ultimate issue," Fed. R. Evid. 704(a), an expert is generally prohibited from offering legal opinions.[1] *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). The reason for this prohibition is that "[i]t is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence." *Id.* Allowing experts to opine that a particular action was unlawful "induce[s] the jurors to substitute their own independent conclusions for that of the experts." *Thompson v. City of Chicago*, 472 F.3d 444, 458 (7th Cir. 2006). Such testimony is therefore inadmissible under Federal Rule of Evidence 403 because it

---

[1] There are some exceptions to this general rule that apply in cases involving legal malpractice or patent law, *see Jimenez*, 732 F.3d at 721 n.7, but no exception applies to the present case.

7

presents a danger that the jury will decide the case on an improper basis rather than on the evidence presented. *Id.* at 457–58. In the present case, I will instruct the jury on the meaning of the Fourth Amendment as applied to excessive-force cases, and it will be for the jury to determine the facts and decide whether the officers used force that was objectively unreasonable under the totality of the circumstances. Thus, to the extent Clark intends to opine that, based on his view of the evidence, the officers used force that was excessive, objectively unreasonable, unjustified, or unwarranted under the totality of the circumstances, his testimony is inadmissible.[2]

However, it is possible to recast Clark's legal opinions as opinions about police policies and training practices. Although Clark frequently expresses his opinions using Fourth Amendment terminology, the overall thrust of his testimony is that he believes that the defendants acted contrary to national standards governing police practices. That is, Clark's testimony could be understood as being that *because* the officers acted contrary to such practices, they violated the Fourth Amendment. The second part of this opinion (the officers violated the Fourth Amendment) is plainly inadmissible as a legal opinion, but the first part (the officers acted contrary to well-established police practices) is not. I will therefore consider whether all of Clark's opinions (both the first and the second kind) are admissible as opinions about police policy.

Turning to that issue, I begin by noting that the Seventh Circuit has identified two problems that frequently arise when a party seeks to offer expert testimony on police

---

[2] The defendants filed a separate motion in limine to exclude any witness from offering legal opinions at trial. (ECF No. 45.) For the reasons stated in the text, that motion will be granted.

8

policies and practices in an excessive-force case. The first is that the excessive-force inquiry is governed by constitutional principles, not police-department regulations, and therefore the probative value of any testimony about police practices may be slight and substantially outweighed by the danger of confusion or one of the other concerns identified in Federal Rule of Evidence 403. *See Brown*, 871 F.3d at 536–38. The Seventh Circuit has gone so far as to say that "a police officer's violation of departmental policy is 'completely immaterial [on] the question . . . whether a violation of the federal constitution has been established.'" *Id.* at 537 (quoting *Thompson*, 472 F.3d at 454). In the present case, Clark does not opine that the defendants violated any specific policy of the Franklin Police Department or the State of Wisconsin. Rather, he opines that the officers violated what he views as a "national use-of-force standard." (Clark Dep. at 36:21–36:23; ECF No. 59.) For this reason, I do not think his opinions are excludable on the ground that they are completely irrelevant to the Fourth Amendment inquiry. *See Brown*, 871 F.3d at 538 ("Evidence of purely localized police procedure is less likely to be helpful than nationally or widely used policy.").[3]

The second issue that the Seventh Circuit has identified in connection with expert testimony on police practices is that such testimony is often not helpful to the trier of fact and therefore does not satisfy Federal Rule of Evidence 702(a). *Brown*, 871 F.3d at 537; *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 601–03 (7th Cir. 2011). The court has

---

[3] The defendants contend that Clark's opinions must be excluded because they are not explicitly based on Wisconsin law-enforcement standards. However, as just discussed, evidence of localized procedure is less helpful than evidence of national trends. *Brown*, 871 F.3d at 538. Thus, Clark's failure to apply specific Wisconsin standards is not a reason to exclude his testimony.

9

observed that, in many excessive-force cases, the question of whether the force used was objectively unreasonable under the circumstances will not require jurors to understand matters that are "beyond the ken of an average layperson." *Florek*, 649 F.3d at 602. In such cases, "evaluating an officer's conduct will draw primarily on the jury's collective common sense" and the "everyday experience of lay jurors." *Brown*, 871 F.3d at 538. Expert testimony on police procedure is particularly likely to be unhelpful "when 'police use[ ] their bare hands in making an arrest, the most primitive form of force.'" *Id.* (quoting *Florek*, 649 F.3d at 602). But this does not mean that all expert testimony on police practices is unhelpful. Rather, such testimony can be helpful when "specialized knowledge of law-enforcement custom or training would assist the jury in understanding the facts or resolving the contested issue." *Id.* at 537. This may occur "when 'something peculiar about law enforcement (e.g., the tools they use or the circumstances they face) informs the issues to be decided by the finder of fact.'" *Id.* at 538. For example, "[i]f a case involves 'a gun, a slapjack, mace, or some other tool, . . . the jury may start to ask itself: what is mace? what is an officer's training on using a gun? how much damage can a slapjack do?'" *Id.* (quoting *Kopf v. Skyrm*, 993 F.2d 374, 379 (4th Cir. 1993)).

The present case is not factually complex and, for the most part, does not involve specialized police tools or other matters outside the understanding of a layperson. Besides the spit hood and the wrap, the officers used only their bare hands to apply force to the plaintiff.[4] Expert testimony is not required to help the jury understand whether,

---

[4] Before handcuffing the plaintiff, the officers threatened him with a TASER, but the plaintiff is not pursuing a claim for excessive force based on the officers' conduct prior to the handcuffing. Thus, any expert testimony about use of a TASER would be irrelevant and inadmissible under Federal Rule of Civil Procedure 402.

10

under the totality of the circumstances, the officers acted with objective reasonableness in throwing the plaintiff's body against the squad car, decentralizing him to the ground, and holding his face against the concrete. Although the spit hood and the wrap might be described as specialized tools, their purposes are easily understood by laypersons: a spit hood is used to stop a subject from spitting on officers, and the wrap is used to stop a subject from kicking officers.[5] In any event, the plaintiff has not disclosed any admissible expert testimony by Clark concerning the spit hood or the wrap. To be sure, Clark does opine that, based on his view of the evidence, the officers did not need to use any force on the plaintiff after he was handcuffed, and that therefore all the force they used, including the spit hood and the wrap, was excessive and in violation of core policing practices. (ECF No. 58-1 at 3, ¶ 17.) But this opinion is not based on the specialized nature of the spit hood or the wrap; it is based on Clark's opinion that, because the plaintiff was under control, the officers should not have used any additional force. Thus, this testimony would not help the jury better understand either the nature of the spit hood and the wrap or how officers are trained to use such tools.[6]

---

[5] The plaintiff has brought a motion in limine to exclude any testimony by the defendants' police-practices expert, Stephen P. Harlow, about the wrap. Like Clark, Harlow does not provide any specialized testimony about the wrap that would be helpful to the jury. Further, the defendants concede that both parties' expert witnesses should be precluded from offering testimony about the wrap. (ECF No. 67 at 7–8.) Therefore, I will grant the plaintiff's motion in limine on this issue.

[6] At his deposition, Clark testified about the nature or the wrap and noted that some models of wrap pose a risk of asphyxiating the subject because those models compress the subject's chest. (Clark Dep. at 30:6–30:18.) However, Clark does not opine that the specific model that the officers used on the plaintiff presented a risk of asphyxia. Instead, he testified that, based on the information that he had, "positional asphyxia" was not an issue in this case. (*Id.* at 30:6–30:18.) Thus, the plaintiff has not disclosed any testimony by Clark about the wrap that would be both relevant to his claims and helpful to the jury.

Moreover, with one exception discussed below, specialized knowledge is not required to understand the circumstances that the officers faced during the uses of force at issue in this case. Regarding the first—throwing the plaintiff's body against the squad car—the officers do not contend that it would have been reasonable for them to do that; instead, they dispute that they used such force. (Rydelski Dep. at 84:15–84:18; Wallace Dep. at 39:9–39:20.) Thus, any testimony about the training that officers receive about throwing subjects against cars would be irrelevant and unhelpful.

Regarding the second use of force—the decentralization—the officers admit that they brought the plaintiff to the ground after he spit on Officer Wallace. However, Clark has not disclosed any specialized testimony on the topic of decentralizations. He does opine that, if the plaintiff spit on the officers, then the officers did not need to use any additional force and could have just placed him in the back of the squad car. (Clark Report at 15–16.) However, Clark does not identify any police policy or practice that would govern this specific situation, *i.e.*, controlling a handcuffed suspect who is spitting at officers. Rather, he merely asserts that the officer's conduct was "excessive in relationship to core policing practices, policies, and trainings." (Clark Report at 16.) Clark does not identify those core practices or explain how they should have been implemented under the specific circumstances the officers faced. Moreover, Clark does not identify any specialized techniques that the officers could have used to force the plaintiff into the backseat of the squad car in lieu of decentralizing him. Accordingly, Clark has not disclosed any testimony about the decentralization that would be helpful to the jury. He may not offer testimony on that topic.

12

The third use of force—holding the plaintiff's face against the concrete to prevent him from continuing to spit at the officers—likewise does not involve specialized police techniques. Moreover, Clark does not identify any specialized training standards or policies that might govern this specific situation. Thus, the plaintiff has not disclosed any relevant, helpful testimony by Clark on this use of force.

The fourth use of force—knee strikes to the torso—is different. Unlike with his other opinions, Clark's testimony on this topic includes a discussion of police policies and procedures that would be helpful to the jury. In his report, Clark explains that national training standards[7] teach officers that there are four general categories of subject behavior (cooperative, resistive, combative, and life threatening) and a general range of appropriate officer responses to each category (ranging from verbal commands to lethal force). (Clark Report at 13.) At his deposition, Clark gave the opinion that knee strikes are appropriate only when a subject is engaging in combative or life-threatening behavior. (Clark Dep. at 56:11–56:24.) He further testified that, under national training standards, even if the plaintiff was shouting, trying to spit on the officers, and trying to kick the officers while he was handcuffed on the ground, he would not be considered "combative" such that knee strikes would be authorized by the standards.[8] (*Id.* at 104:25–108:9.) Clark goes on to opine that the appropriate response to this behavior under the national standards

---

[7] Clark identifies the training standards as "Peace Operations Specialized Training" or "POST." (Clark Report at 14.)

[8] Clark did not use the term "combative" in this part of his testimony. Instead, he testified that the plaintiff was not exhibiting behavior that, under national standards, justified using knee strikes. But I think it is fair to characterize his testimony as meaning that the described behavior would be deemed only resistive, not combative, under the national standards.

13

would have been for the two officers to continue pinning the plaintiff to the ground until he calmed down and stopped resisting. (*Id.* at 108:11–109:18.) Clark states that, in his experience, a subject will calm down in less than one minute once he is restrained in this fashion. (*Id.* at 109:19–110:9.) All this testimony on knee strikes would be helpful to the jury because the average layperson will not know how officers are trained to handle subjects who offer the kind of resistance that, in the officers' view, the plaintiff exhibited. The jury might wonder whether officers are trained that they may strike a handcuffed subject who is restrained but continues to resist the arrest or whether they are trained that they must continue restraining the subject until he calms down.

Moreover, Clark's testimony about knee strikes is not simply a legal opinion that knee strikes were excessive under the totality of the circumstances. The testimony is based on national training standards outlining the categories of subject behavior and appropriate police responses and on Clark's own experience in dealing with subjects who resist arrest. Although the training standards mirror the Fourth Amendment's reasonableness standard to some extent, that is to be expected, as one of the purposes of training an officer on the use of force is to ensure that the officer complies with the Constitution. Experts in police practices are allowed to testify about national training standards and may even opine that the police acted unreasonably, provided that they do so in an area involving specialized matters outside the knowledge of an average layperson. *See Florek*, 871 F.3d at 538. Here, Clark opines about a particular technique used in law enforcement—knee strikes—and describes what national training standards say about when it is appropriate to use that technique. He also explains that, in his experience, a pinned and restrained subject normally calms down in less than one minute,

14

which is something that a layperson is unlikely to know from everyday experience. These are the kinds of opinions concerning police practices that the cases deem helpful and otherwise admissible. *See Brown*, 871 F.3d at 537 ("[I]if it's standard practice across the country to train officers to handle a given situation in a particular way, expert testimony about that training might aid a jury tasked with evaluating the conduct of an officer in that specific situation.").

As discussed in the background section, after the officers administered knee strikes to the plaintiff, he stopped resisting, and the officers were able to complete their custodial search and place the plaintiff in the backseat of the squad car. However, the officers claim that, as soon as they placed the plaintiff on the backseat, he leaned to the side and kicked Officer Wallace in the thigh or groin area. The squad car video corroborates the officers' claim that the plaintiff kicked one of them. In response to the kick, the officers removed the plaintiff from the backseat, put him back on the ground, and restrained him in the wrap. The plaintiff has not disclosed, in accordance with Federal Rule of Civil Procedure 26(a)(2), any expert testimony by Clark about whether the officers acted appropriately if, as they say and as the video shows, the plaintiff kicked one of the officers as they were putting him in the backseat. However, in a brief in response to one of the defendants' motions in limine, the plaintiff asserts that Clark will testify that the officers used excessive force when they reacted to the plaintiff's kick. (ECF No. 68 at 4–5.) This testimony is purportedly based on Clark's having recently watched two videos: the video of the plaintiff's kicking the officers and their removing him from the backseat of the squad car and a video taken from the dash camera of a second squad car. According to the plaintiff's brief, Clark will testify that, when he watched the videos, he saw an officer

15

place his hands on the plaintiff's throat, which was "inappropriate" and could have caused "a suffocation event." (*Id.*) Plaintiff's brief also states that Clark will testify that the dash-camera video shows "an officer" kneeling on the plaintiff's back for an extended period of time. (*Id.* at 5.) The plaintiff states that Clark will state that "this use of force was excessive or unnecessary." (*Id.*)

This proposed testimony by Clark is inadmissible for two reasons. First, the plaintiff has not properly disclosed it as required by Rule 26(a)(2) and Civil Local Rule 26(b). Because Clark is a retained expert witness, Rule 26(a)(2) required the plaintiff to provide a report that included, among other things, a complete statement of his opinions and the facts or data he considered when forming them. *See* Fed. R. Civ. P. 26(a)(2)(B). Under the scheduling order for this case, Clark's report was due on December 16, 2020. (ECF No. 13, ¶ 3.) The plaintiff's statement in his brief in opposition to the defendants' motion in limine describing Clark's new opinions was not made until March 21, 2022. Moreover, the plaintiff's statement in his brief is not a proper report under Rule 26(a)(2), as it was not "prepared and signed by the witness." Thus, to this day, the plaintiff has not properly disclosed any testimony by Clark about the officers' placing hands on the plaintiff's throat or kneeling on his back.[9]

---

[9] The plaintiff filed an affidavit from Clark dated March 11, 2022, in which Clark states that he has viewed the two videos in question and believes that they reinforce the opinions he disclosed in his original report. (ECF No. 65.) However, in the affidavit, Clark does not aver that he holds the two new opinions that the plaintiff attributes to him in the brief: that the officers improperly put hands on the plaintiff's throat and kneeled on his back. Thus, the March 2022 affidavit does not qualify as a report disclosing these two opinions under Rule 26(a)(2).

16

Under Federal Rule of Civil Procedure 37(c)(1), failing to properly disclose expert testimony results in the testimony being inadmissible at trial unless the proponent of the testimony shows that the failure to disclose was substantially justified or is harmless. Here, the plaintiff has not attempted to show that his failure to properly disclose Clark's testimony about placing hands on his throat and kneeling on his back was substantially justified or is harmless. Moreover, the defendants have shown that this failure to disclose was neither substantially justified nor harmless. (ECF No. 76 at 3–4.) The plaintiff has had access to the squad videos since before Clark was deposed on June 14, 2021, so there is no reason why his testimony about the videos could not have been disclosed well before March 21, 2022. Further, this last-minute disclosure is not harmless because discovery is closed and the defendants cannot now depose Clark or the plaintiff about these new opinions or have their own expert review and opine about Clark's testimony.

The second reason why the statements that the plaintiff attributes to Clark in his brief are inadmissible is because they do not satisfy Rules 403 and 702. In neither opinion does the plaintiff identify any applicable national policing standard or specialized police knowledge. In the first opinion, the plaintiff states that placing hands on a person's throat may cause suffocation. This fact is obviously well within the common knowledge of lay jurors, and so expert testimony would be unhelpful. The plaintiff also states that placing hands on a person's throat is "inappropriate," but this is not further explained. To the extent that this is simply a statement that the force used was excessive, it is inadmissible under Rule 403 as a pure legal opinion. To the extent that this is a statement that the officer acted contrary to national policing standards, it is inadmissible under Rule 702 because no such standard is identified and thus the opinion is unhelpful and not the

17

product of sufficient facts or data or reliable principles and methods. In the second opinion, the plaintiff states that kneeling on the plaintiff's back was "excessive and unnecessary." Again, to the extent that this is a statement that the force used was excessive, it is inadmissible under Rule 403 as a pure legal opinion, and to the extent that it is a statement that the officer acted contrary to national policing standards, it is inadmissible because no such standards are identified or applied. Thus, Clark will not be permitted to testify about the officers' placing their hands on the plaintiff's throat or kneeling on his back.[10]

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion to exclude the testimony of Roger Clark (ECF No. 56) is **GRANTED IN PART** and **DENIED IN PART**. The motion is denied to the extent that Clark will be permitted to testify about whether the officers acted consistently with national policing standards when they delivered knee strikes to the plaintiff. The motion is granted as to all other testimony.

**IT IS FURTHER ORDERED** that the defendants' second motion in limine (ECF No. 43) is **GRANTED**.

---

[10] The parties addressed Clark's opinions about placing hands on the plaintiff's throat and kneeling on his back in their briefs filed in connection with the defendants' third motion in limine, in which the defendants seek to exclude testimony that the Franklin Police Department endorsed dangerous or "out of policy" tactics. (ECF No. 46.) Clark does not offer any opinions about the Franklin Police Department's polices, and the plaintiff has not otherwise pointed to evidence in the record about the department's policies. In any event, because the plaintiff has not brought a § 1983 claim against the City of Franklin, any evidence about its policies or practices would be irrelevant. *See Thompson*, 472 F.3d at 454–55 (holding that evidence about police-department regulations is "completely immaterial" to the question of whether an individual officer used excessive force). Thus, the defendant's third motion in limine will be granted.

**IT IS FURTHER ORDERED** that the plaintiff's motion to exclude expert testimony from Stephen P. Harlow about the wrap (ECF No. 54) is **GRANTED**.

**FINALLY, IT IS ORDERED** that defendants' third motion in limine (ECF No. 43) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 20th day of April, 2022.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge